UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROBERT MURPHY ET AL )<br>)<br>PLAINTIFFS )<br>)<br>VS. )<br>)<br>ZONING COMMISSION OF THE )<br>TOWN OF NEW MILFORD ET AL )<br>)<br>DEFENDANTS )<br>) | CIVIL ACTION NO.<br><br>300CV2297HBF<br><br><br><br>OCTOBER 24, 2003 |

LIST OF ATTACHMENTS

A.   ACLJ Demand Letter Dated March 4, 1999

B.   ACLJ Complaint for <u>Reiter v. City & County of Denver</u>

C.   ACLJ Press Release dated August 3, 1999 showing a version of the facts of the case.

D.   Court Appointed Committee Instruction Form showing court approved hourly rate of $150.00.

16

# ATTACHMENT "A"

# THE AMERICAN CENTER FOR LAW AND JUSTICE

## A.C.L.J. Cases

This is a copy of the ACLJ demand letter sent in response to the Cease and Desist Order issued by the City of Denver, Colorado. In an effort to protect the interests of our clients, the actual names and addresses of persons and locations have been deleted.

March 4, 1999

Director
Board of Zoning

**Re: Unlawful Cease and Desist Order against Our Clients.**

Dear Director:

Our clients have requested the American Center for Law and Justice ("ACLJ") to notify the City and County of Denver ("City") that the Zoning Administration's Cease and Desist Order of October 26, 1998, ("Order") is invalid under the United States Constitution. The Order, which prohibits more than one "prayer meeting" a month in our client's residence, violates their constitutional rights to due process, equal protection, free speech, and free exercise of religion.

By way of introduction, the ACLJ is a not-for-profit public interest law and educational group. Our organization exists to educate the public and government about the constitutional rights of citizens, particularly in regard to the expression of religious sentiments. We render assistance to a significant number of people in situations similar to the one that our clients now face.

The facts of this matter are set forth below, followed by a legal analysis covering equal protection, due process, and free exercise issues. After reviewing this letter, we respectfully request that you take the steps necessary to immediately rescind the offending Order.

**I. STATEMENT OF FACTS**

Our client is a full-time associate pastor at a local Denver church which is a "cell-based" ministry comprised of Christians who believe that their faith is best exercised in small group meetings in their homes. For example, members receive spiritual counseling, teach and are taught church doctrine, and study religious literature in small groups that meet in private homes. Acts of worship occur both in the home setting and at the ministry's congregational facility.



Thou Shalt not display the 10 commandments??

**Hear our AUDIO CLIP!**



On October 1, 1997, our clients purchased a house in a Denver, Colorado neighborhood.(FNI) The house is in an area zoned for residential use by right, and is classified as "R-1" under the City's Zoning District Regulations. Some six months later, in March, 1998, our clients opened their home to women who wished to develop their faith by studying Christian literature. These meetings were led by our client and lasted for about two to three hours each Thursday evening. Our clients anticipated that the series of meetings would continue indefinitely; once the first book study was completed, they would likely begin another. Typically, nine to fifteen women would attend each meeting. Some of the women would ride together, so on the average about ten cars would be parked by attendees. The focus of each meeting was book study, although the women would typically open and close the meeting in prayer and normally would share a pot-luck meal before the study. None of the meeting activities were evident from outside the residence.

At the second meeting of the group, a neighbor who lives across the street from our clients confronted our clients and complained about the number of cars parked on the street during the meeting. These cars were parked within the public right-of-way, and did not block access to any residence. Residents, visitors, tradesmen, patrons of nearby commercial establishments and others may freely park along the street on which our clients reside, so long as they comply with city parking regulations. Nonetheless, our clients encouraged the women not to park in front of that neighbor's house. The women generally complied with this request. A couple weeks later, a different neighbor complained about a car that was parked in front of their house. Although the car was in the public right-of-way and not blocking anyone's access, it was moved as a courtesy to the neighbor and attendees subsequently avoided parking in front of that house. Despite these efforts to avoid confrontation, occasionally someone attending the meeting would park in front of one of these two neighbors, which sometimes engendered another complaint. To avoid further friction, our clients then encouraged the women to park adjacent to a commercial tennis and pool club about one block from our clients' residence. The women usually complied.(FN2)

On October 8, 1998, City zoning specialist wrote to our clients to demand a "routine zoning inspection" in regard to prayer meetings at our clients' residence. After receiving the letter, our clients spoke with the specialist on the telephone. The specialist asked about the meetings taking place at our clients' residence. In reply, our clients stated that the gathering involved several different things, including religious fellowship, study and prayer. He told him/ her it was not a "prayer meeting" although some prayer took place during the meeting. The specialist told our clients that "more than one prayer meeting a month" was impermissible and that he/ she would send out a cease and desist order.

On October 26, 1998, the City issued its Order that prohibited our clients from holding more than one prayer meeting a month.(FN3) According to the Order, "[p]rayer meetings are held more than once a month in the single unit dwelling on the above referenced zone lot in violation of [§59-80(6)(a)1.a] (FN4) of the Denver Zoning District Regulations.(FN5) On November 6, 1998, our clients filed a timely appeal of the Order with the Board of Adjustments for Zoning Appeals. While conversing with you and another City

employee on February 6, you remarked that if our clients were having a "book club" in their home once a week rather than a "prayer meeting," then it would most likely be "no problem."

The Appeal was heard on February 16, 1999. On February 17, 1999, you denied the requested Administrative Review and affirmed the Board's October 26, 1999 Order. As of this writing, the Order will prohibit our clients from having more than one "prayer meeting" a month after March 19, 1999. Failure to comply will subject our clients to criminal sanctions.

## II. LEGAL ANALYSIS

### A. The Order violates our clients' due process rights.

Government regulations that are overly vague or arbitrary may violate the Fourteenth Amendment due process rights of private citizens:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [government officials] on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications.

*Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972). The Order, and the underlying zoning regulation that prohibits private individuals from gathering to pray in a private home more often than once a month, are invalid because they are vague in definition and arbitrarily applied.

### 1. The Order is unconstitutionally vague.

A government regulation is "impermissibly vague if, by its terms, it fails to provide adequate notice of its scope, and sufficient guidance for its application." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972). In other words, a "statute is void if persons of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Const. Co.*, 269 U.S. 385 (1926).

In this case, one has to guess at what "prayer meeting" means. The City zoning administrator arbitrarily determined "that one (1) prayer meeting per month shall be clearly incidental and customary to and commonly associated with the operation of the use by right" at residences within the R-1 zone. See Order, § 59-80(6)(a)1.a. The City offers no more guidance than that. There is no definition of what comprises a "prayer meeting," no guidance as to the degree of permissible off-site impacts, and no valid regulation of the time, place, or manner in which a prayer meeting may be conducted. Simply put, no one with ordinary intelligence knows when a social

gathering in their home may suddenly evolve from a permissible activity into a forbidden "prayer meeting."

It takes little imagination to see the problem with this regulation. For example, our clients ask grace before their daily meals. Is he/she now limited to asking grace once a month? If not, then what if a few friends join the family for a weekly Sunday dinner and saying grace evolves into more prolonged, intercessory prayer? Similarly, if he/she leads the family in Bible study once a week, may he/she only do so if they refrain from prayer? For that matter, what if our clients host a weekly get-together with a dozen friends to watch Monday Night Football and they pray for their favored team's victory? The examples may seem absurd, but they clearly demonstrate the impermissible vagueness of the City's regulations and Order as well as the substantial burden placed upon fundamental First Amendment rights.

A very similar regulation was stricken in *Nichols v. Planning and Zoning Commission*, 667 F. Supp. 72 (D. Conn. 1987). In *Nichols*, the plaintiff led thrice-weekly meetings of up to ten persons in his home, leading them in prayer, song, discussion, and Bible study. *Id.* at 75. After the meetings had been held for over two years, a neighbor complained that "religious services" were being held in the home. *Id.* The relevant zoning regulations would have required the plaintiff to obtain a special use permit if he used his home for a "church, parish hall, or other religious use . . . ." *Id.* (FN6) Here, the zoning authority ordered that the meeting cease because no permit for "other religious use" had been obtained. *Id.*

Enforcement of that order was enjoined because it was impermissibly vague. The *Nichols* court noted that when a regulation "threatens to inhibit the exercise of constitutionally protected rights[,] . . . the Court must demand of that regulation the utmost clarity of the conduct it is intended to prohibit." *Id.* at 77 (emphasis added) (citations omitted); see also *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982) (laws that interfere with the right to free speech or association are subject to more stringent vagueness test). The court pointed out that the challenged order lacked clarity:

> "[O]ther religious use" does not provide for the citizen of ordinary intelligence a clear standard by which to regulate his activities. For example, [the regulation] does not assure with certainty whether one may hold Passover Seder in his home, whether he may light a Hanukkah Menorah, meet with a group of youths in one's home to prepare them for the reception of the sacraments [sic] of confirmation or communion, or gather with friends to discuss the Bible. Similarly, it lacks the certainty necessary to forewarn the plaintiffs here that a small group of like-minded individuals . . . may not meet in Nichols' home to interact as their religion may dictate. One who wishes to comply with the regulation may be inhibited from engaging in a much larger sphere of conduct than the legislative body intended to proscribe.

*Id.* at 77-78. Such vagueness did not survive the court's scrutiny. *Id.* at 77.

Similarly, in *New Jersey v. Cameron*, 498 A.2d 1217 (N.J. 1985), the state charged that a minister violated a zoning ordinance when he held religious services in his home within a residential zone. *Id.* At 1218. The services were "attended by about twenty-five people and were conducted once each week for one hour." Id. Here, the zoning ordinance excluded "churches and similar places of worship" from the residential use zone that included the plaintiff's neighborhood. *Id.* at 1218-19. The minister successfully argued that his conviction for violating the ordinance was invalid because the term "church" was vague when it was applied to him. *Id.* at 1221.

The *Cameron* court recognized that "the term 'church' encompasses various possible meanings, and subtle distinction in meaning can have critically different consequences when sought to be applied . . . in a context that involves constitutionally-protected interests. *Id.* at 1222. The flaw found by the *Cameron* court is virtually identical to the flaw in Denver's "prayer meeting" language: The "indefinite meanings focusing on religious activity alone fail to furnish adequate warning or sufficiently specific guidelines to assure its fair and consistent enforcement." *Id.* at 1223. The minister prevailed when the court held the ordinance "impermissibly vague as applied to the defendant." *Id.*

In other words, the minister in *Cameron* could not tell when his in-home activity would suddenly convert his house into a "church," just as our clients cannot tell when a private gathering within their home becomes a forbidden "prayer meeting." It is very likely that the City's Order and zoning regulations are facially invalid, as was the ordinance in *Nichols*. Most certainly, the Order and underlying regulations are invalid as applied to our clients. The conclusion is the same in either case: the City's actions are blatantly unconstitutional and the Order may not be lawfully enforced.

### 2. The zoning specialist's determination that our clients' group is a "prayer meeting" is an unlawful ad hoc exercise of power.

The second fatal flaw in the Order and its underlying regulations is that the zoning specialist arbitrarily determined that our clients' small group was a "prayer meeting"without having any guidance beyond her subjective inclinations. As the *Nichols* court said: "Without articulable standards, the Regulations 'delegate[] basic policy matters to a [Zoning Enforcement Officer] on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications." 667 F. Supp. at 78 (quoting *Grayned*, 408 U.S. at 109) (alterations in original).

When our clients responded to the October 8, 1998 letter from a City employee, they clearly explained that what they had was not a "prayer meeting" but a gathering of women that happened to include prayer as a minor amount of the total time expended. Yet the October 26, 1998 order arbitrarily deemed our clients' group to be a "prayer meeting." Despite persistent efforts, our clients were unable to discover any objective criteria used by the City to distinguish "prayer meetings" from other social gatherings. Nor could they find any analysis on the record relating either prayer or a monthly time period to any government interest. Absent such

information, we can only conclude that the City's application of its zoning policy in this instance was a purely subjective, arbitrary act. Again, the *Nichols* court pointed out why wielding government authority on a whim is so dangerous:

> To allow the Zoning Board or the Zoning Enforcement Officer indiscriminately to continue to declare one's use of his home as an "other religious use" and thereby prohibit that use under [the zoning regulations] would plant the seed for "covert forms of discrimination," and provide the means by which the Town . . . could "suppress[] a particular point of view."

*Nichols*, 667 F. Supp. at 78 (first alteration added) (quoting *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981)).

The City's Order and regulation target the content of private speech within a private home, rather than the actual effects of a particular property use. This certainly raises the specter of discrimination. Moreover, it is rather curious that no similar order has issued against the nearby tennis club, which treats the street on which our clients reside as an overflow parking lot on almost every weekend during the summer months. Whether discrimination is present or not must remain an open question for the moment. However, there is no doubt that the Order is invalid because this vague and arbitrary application of the City's power cuts too close to the heart of rights guaranteed by the First Amendment.

### B. Our clients have been denied the equal protection of the laws.

The United States Constitution guarantees that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., Amend. XIV. The Equal Protection Clause requires that the government treat equally all persons similarly situated. *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1977). Where a fundamental right is involved, the government action is presumptively invalid and may survive only if the action is necessary to achieve a *compelling governmental interest, and is narrowly tailored to achieve further that interest.* Id. at 440; see also *Perry Educ. Ass'n v. Perry Local Educ. Ass'n*, 460 U.S. 37, 45 (1983). Even when state action does not burden fundamental rights, it may be stricken when it bears no rational relationship to some legitimate government interest. *Romer v. Evans*, 517 U.S. 620, 632 (1996). Whether the Order is tested under strict scrutiny or the rational basis test, the City's targeting of prayer meetings is impermissible.

### 1. The Order burdens a fundamental right and is presumptively invalid under the strict scrutiny test.

If the City is to maintain that what our clients are doing is a "prayer meeting," then it must admit that its Order is directed precisely at religious speech and that it burdens the fundamental rights of free speech, free association, and free exercise of religion. The Order is therefore presumptively invalid, and because the City fails to identify a compelling interest to justify that burden, the Order is in fact invalid.

First, the free exercise of religion is a fundamental right under the First Amendment. *Meyer v. Grant*, 486 U.S. 420 (1988). The Supreme Court has stated that:

> Our precedent establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression. Indeed, in Anglo-American history, at least, government suppression of speech has so commonly been directed precisely at religious speech that a free-speech clause without religion would be Hamlet without the prince.

*Capitol Square Review and Advisory Bd v. Pinette*, 115 U.S. 753, 760 (1995) (emphasis in original). Religious speech, worship, and discussion of religious topics are all core First Amendment speech, see *Widmar v. Vincent*, 454 U.S. 263, 269 n.6 (1981), and our clients' small-group meeting enjoys all the protections offered by the First Amendment.

The City burdens that fundamental right by flatly prohibiting our clients from exercising their faith through communal prayer more than once a month. The City offers no compelling interest to justify that prohibition. In fact, the only interest advanced to justify the discriminatory Order is that some neighbors have had a negative reaction to the small group meeting. Disgruntled neighbors, however, do not constitute a "compelling governmental interest." *Alpine Christian Fellowship v. County Comm'rs*, 870 F. Supp. 991, 994 (D. Col. 1994).

The few specific allegations on record, such as parking in front of a driveway or having a parked car edge up onto the sidewalk, could be easily dealt with by enforcing existing traffic laws. There is no need in this situation to eviscerate First Amendment rights that protect private speech within a private home. If, as those who petitioned in opposition alleged, there are violations of parking regulations, then the remedy is to enforce the parking regulations, not to suppress free speech.

### 2. The Order would fail even under the "rational basis" test.

Even if there were no fundamental interest at stake here, the City's Order is constitutionally flawed. At an irreducible minimum, any zoning action must have a rational relationship to a legitimate government interest. *City of Cleburne*, 473 U.S. at 441. Typically, there may be legitimate government interests that bear on zoning issues, such as orderly development, public safety, and fostering an environment conducive to a particular use. See *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 394 (1926).

For example, in *Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464 (8th Cir. 1991) a city excluded churches from a commercial zone, claiming it had a legitimate interest to foster commerce. *Id.* at 467. However, the city allowed other noncommercial entities, such as Alcoholics Anonymous, to be in the commercial zone. *Id.* at 471. While the court recognized that the city could prefer commercial entities in a commercial zone, the court could discern no rationale for excluding churches while

permitting similar, albeit secular, noncommercial organizations into the zone. *Id.* at 471-2.

Our clients are in the same situation as the church was in *Cornerstone.* You told our clients that if they were gathering friends only to study a book, there would likely be "no problem." The sole distinction between the City's permissible book study and the impermissible prayer meeting is the content of the speech that occurs during the meeting. That content-based distinction has no connection whatsoever with any government interest. As the Supreme Court recently said, "we insist on knowing the relation between the classification adopted and the object to be attained." *Romer,* 517 U.S. at 532. Here, there is nothing to know because there is no relationship between the content of speech among persons meeting in a private home and any conceivable zoning issue. The Order and its underlying regulations are invalid as there is no legitimate government interest identified and no rational relationship to any conceivable zoning issue.

### C. The Order violates our clients' free exercise rights.

"At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 532 (1993). There can be no doubt that our clients' group is exercising its faith and is therefore squarely within the bulwark of the First Amendment. Under contemporary Free Exercise Clause jurisprudence, the City's Order and supporting regulations are constitutionally invalid.

Supreme Court "cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Id.* at 531 (citing to *Employment Div., Dept. of Human Resources of Oregon v. Smith,* 494 U.S. 872 (1990)). However, a law that is not facially neutral and generally applicable "must undergo the most rigorous of scrutiny. "To satisfy the demands of the First Amendment, a law restrictive of religious practice must advance 'interests of the highest order' and must be narrowly tailored in pursuit of those interests." *Lukumi,* 508 U.S. at 546 (citing to *McDaniel v. Paty,* 435 U.S. 618, 628 (1978) (quoting *Wisconsin v. Yoder,* 406 U.S. 205, 215 (1972)). The City's regulation is not neutral and generally applicable and must fail under strict scrutiny.

Moreover, even if the City could prove its Order and the underlying regulations were facially neutral and generally applicable, it would not escape the death knell of strict scrutiny. Within the Tenth Circuit, strict scrutiny may apply to neutral and generally applicable laws under the "hybrid claim" theory. This occurs when the claimant shows "a 'colorable claim of infringement' [of a constitutional right], that is, something less than an outright violation of a companion right yet more than a simple allegation." *Thomas v. Anchorage Equal Rights Comm'n,* 165 F.3d 692, 703 (9th Cir. 1999) (citing to *Swanson v. Guthrie Indep. Sch. Dist.,* 135 F.3d 694, 700 (10th Cir. 1998)); see also *Smith,* 494 U.S. at 881 (discussing Free Exercise claims that implicate other First Amendment claims). In this case, the Order and its related

Case 3:00-cv-02297-HBF    Document 116-2    Filed 10/27/2003    Page 11 of 13

regulations directly offend the First Amendment freedoms of speech, association, and privacy, and thus allow a hybrid claim to be advanced.

### 1. The Order and regulations are not neutral and generally applicable because they target religious speech.

"[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral, and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *Lukumi*, 508 U.S. at 533. The Order and its associated regulations do not neutrally address the effects of just any social gathering in a residential area, but rather prohibit one particular type of gathering--a "prayer meeting." The Order directly restricts the religious practice of communal prayer in private homes.

As discussed exhaustively above, the City advances no clear governmental interest to justify prohibiting private corporate prayer, much less any compelling interest. The only interest apparent in the record is found in the private petition filed at the February 16, 1999 hearing. Assuming, arguendo, that the City's interests parallel those of the petitioners, then it is left with only conclusory statements that an unspecified "external factor" somehow affects property values and that there may be some problems with parking in the public right-of-way. These are scarcely "compelling" interests that justify prohibiting the free exercise of religion. Yet, even if there were some compelling interest, the City's regulatory scheme that permits but a single "prayer meeting" a month in any R-1 zone, regardless of access, parking availability, noise levels, pedestrian safety concerns, and other site-specific issues, is not in the least a "narrowly tailored resolution."(FN 7) The Order thus fails every element of strict scrutiny.

### 2. Even if the Order and regulations were facially neutral, they would fail under strict scrutiny arising from a hybrid claim.

When a Free Exercise claim is combined with "a colorable showing of infringement of recognized and specific constitutional rights," heightened scrutiny applies. *Swanson*, 135 F.3d at 700; see also *Yoder*, 406 U.S. at 233; *Anchorage Equal Rights Comm'n*, 165 F.3d at 705. Strict scrutiny applies here because the City's Order and regulations infringe upon our clients' rights to free association, free speech, and privacy.

"An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). This right to free association is seriously degraded because the utterly ambiguous "prayer meeting" term potentially extends to any time our clients pray with another person in their home. Again, the absurdity of the example only serves to illustrate the seriousness of the impact on the right to free association.

Similarly, prayer is a form of speech and speech is unequivocally

protected by the First Amendment. Singing hymns, reading the Bible, and discussing religious literature are fully protected expression under the First Amendment. *Widmar,* 454 U.S. at 269 n.6. Prohibiting "prayer meetings" is nothing less than an impermissible content-based ban. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector and Visitors of University of Virginia,* 515 U.S. 819 (1995). Indeed, the Order and its supporting regulations would fail on the free speech issue alone. But for the press of time, we would address this pure freedom of speech issue at length.

Moreover, the Order seriously compromises our clients' privacy rights by regulating what they say and what they read in the privacy of their own home. "If the First Amendment means anything, it means that a State has no business telling a man sitting alone in his own house, what books he may read . . . . Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds." *Stanley v. Georgia,* 394 U.S. 557, 565 (1969) (striking law that prohibited private possession of obscene materials). Neither does the City have any business telling a few people gathering in a private house that they may not pray together on a regular basis.

Thus, no less than three fundamental constitutional rights are hybridized with the free exercise claim. Under *Swanson,* strict scrutiny would apply, and as discussed above, the Order would fail every element of strict scrutiny.

### III. Conclusion and Demand

The City's Order is impermissibly vague and violates our clients' constitutional rights to equal protection, due process, and the First Amendment rights of free association, speech, exercise of religion, and the right to privacy in their own home.

As you are aware, the violation of an individual's constitutional rights, even for a moment, results in an irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 376 (1976). Our clients have already suffered irreparable injury and that injury must not be compounded by the City enforcing an unlawful Cease and Desist Order. Therefore, at a minimum, the City must immediately rescind the February 17, 1999 Order and begin the necessary revision of its zoning regulations to avoid the constitutional infirmities identified above. If relief from the City's unlawful order is not promptly obtained, we will be forced to advise our clients of their right to seek redress in federal court.

We realize that the allegations of unlawful parking and discourteous behavior that were raised before the Appeals Board may merit further consideration. Our clients are most willing to work with the City's law enforcement personnel and their neighbors to eliminate unlawful parking and to minimize the perception of discourteous behavior by some persons attending gatherings at our clients' home. It does not seem unreasonable to think that heightened attention to proper parking may resolve the true issue here.

In light of the constitutional issues at stake, we would appreciate a response from you indicating your position on this matter no later than close of business on March 12, 1999.

Sincerely,
American Center for Law
and Justice

---

**Footnotes**

(1) In an effort to protect our clients' interests, a more detailed description of the property has been deleted.

(2) Although the women used only an insignificant amount of parking during off- hours for the club, the reverse is not true. Persons attending the club events frequently park all the way up and down the residential portion of the street on which our clients reside. This congestion occurs almost every day during the summer months, and especially on weekends.

(3) The October 26, 1998 Order to Cease and Desist ("Order") also ordered our clients to cease renting space in their home to an unrelated single mother and her child. That portion of the Order is not discussed in this letter.

(4) Section 59-80(6)(a)1.a states that accessory uses "shall be clearly incidental and customary to and commonly associated with the operation of the use by right." Under § 59-38(10), the zoning administrator "determine[s] what uses are common and customary to a specific use by right and if the use is incidental to the specific use by right; and impose limitations which shall be uniform throughout the zoning district on specific accessory uses taking into consideration the intensity of the accessory use, numbers, the space required by the accessory use and the effect on adjacent property."

(5) All section numbers hereafter refer to the zoning regulations, unless otherwise noted.

(6) This parallels the City of Denver zoning scheme allowing accessory uses to a use by right via an exception, a condition use permit, or a use by special review.§ 59-80(6).

(7) If, as the record suggests, the core issue here is really nothing more than a contest over who parks where, then the holding in *Nichols* may well presage the holding in this case should litigation ensue. "The injunction temporarily enjoins [the city] from stopping the meetings in Nichols's home of 'a small select group of like minded individuals for the purpose of prayer, worship, and religious discussion'. . . In return . . . all persons attending [Nichols'] meetings will park either in his driveway or in legally designated parking areas on the street without blocking the driveways of other residents. . ." *Nichols*, 667 F. Supp. at 76 n.4. The City does not need to bludgeon the First Amendment in order to resolve a parking dispute.

---

**The contents of this website do not constitute legal advice. If you are seeking legal advice, you will need to contact an**